UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CARLOS SMITH PITTERSON,

                Defendant.

19 Cr. 468 (JSR) (SDA)

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
# IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE HIS CONVICTION

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Nicholas W. Chiuchiolo
Daniel G. Nessim
Assistant United States Attorneys
   *Of Counsel*

# Table of Authorities

**Cases**

*Gordon v. Lavalley*, 13 Civ. 4401 (ALC) (AJP), 2014 WL 888468 *15 (S.D.N.Y. Mar. 6, 2014) .................................................................................................................................... 11
*Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) ........................................................... 12
*McCoy v. Louisiana*, 138 S. t. 1500, 1511 (2018) ...................................................... 11
*Rosemond*, 958 F.3d at 121 ...................................................................................... 9, 12
*Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984). .............................. 8, 9
*United States v. Arce*, 276 F. App'x 13, 13 (2d Cir. 2008) ............................................. 6
*United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004). .......................................... 9
*United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) .................................. 8, 10
*United States v. Lewis*, 523 F. App'x 814, 820 (2d Cir. 2013) ...................................... 14
*United States v. Nolan*, 956 F.3d 71, 83 (2d Cir. 2020). ................................................ 9
*United States v. Pestana*, 865 F. Supp. 2d 357, 361 (S.D.N.Y. 2011) .................... 10, 12
*United States v. Posada-Rios*, 158 F.3d 832, 874 (5th Cir. 1998) ............................... 10
*United States v. Valdez*, 426 F.3d 178, 184 (2d Cir.2005) ........................................... 13
*Zodhiates v. United States*, No. 14-CR-175-RJA, 2022 WL 3605957, at *12 (W.D.N.Y. Aug. 23, 2022) ................................................................................................................................ 11

**Statutes**

18 U.S.C. § 3553(f) .................................................................................................. 5, 6, 7
Title 28, United States Code, Section 2255 .................................................................. 1, 8

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................ 1
BACKGROUND ........................................................................................................................ 1
    A. Petitioner's Criminal Conduct and Arrest............................................................... 1
    B. The Defense Case and Verdict ................................................................................ 3
    C. The Sentencing ........................................................................................................ 5
    D. The Appeal .............................................................................................................. 7
ARGUMENT .............................................................................................................................. 8
    I. Petitioner did not receive ineffective assistance of counsel. ..................................... 8
        A. Applicable Law ................................................................................................. 8
        B. Defense Counsel's Performance at Trial Was Not Deficient. ........................... 9
        C. Defense Counsel's Performance at Sentencing Was Not Deficient. ............... 13
CONCLUSION ........................................................................................................................ 15

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to the motion (the "Motion") of Carlos Smith Pitterson ("Smith Pitterson" or "Petitioner") to vacate, set aside, or correct his conviction and sentence pursuant to Title 28, United States Code, Section 2255. Petitioner requests, in substance, that the Court vacate his conviction and sentence because he received ineffective assistance of counsel. Specifically, Petitioner alleges that his trial attorney refused and/or failed to put forth a duress defense and failed to seek a sentencing departure based on alleged threats that were directed at him at the time of the offense conduct. For the reasons set forth herein, the Motion should be denied.

**BACKGROUND**

**A. Petitioner's Criminal Conduct and Arrest**

The evidence at trial established that Petitioner sold large quantities of heroin and fentanyl to a confidential source working with the Drug Enforcement Administration (the "CS"). The Government's proof at trial included testimony from multiple witnesses, including the CS, law enforcement witnesses who surveilled Petitioner's meetings with the CS, and lab technicians who tested the narcotics sold by, and recovered from, Petitioner. The trial evidence also included recordings of Petitioner's narcotics transactions and phone conversations with the CS, translations of those recordings, and narcotics recovered from Petitioner's transactions with the CS and from a search of Petitioner's car and residence.

In April and May of 2019, Petitioner sold narcotics to the CS on multiple occasions. The CS was initially put in contact with Petitioner by an individual in the Dominican Republic who stated that Petitioner would be able to supply the CS with approximately 450 fentanyl pills. (PSR

¶ 12).[1] When the CS contacted Petitioner by phone, Petitioner directed the CS to meet at a location in the Bronx, New York—outside of the apartment building where Petitioner and his family resided. (PSR ¶ 13). At that first meeting on April 25, 2019, Petitioner sold the CS roughly 450 fentanyl pills, weighing approximately 48.5 grams, in exchange for approximately $7,000. (PSR ¶ 13).

Petitioner sold additional fentanyl pills to the CS on subsequent occasions. On May 1, 2019, Petitioner sold the CS approximately 150 fentanyl pills, weighing approximately 16 grams, in exchange for approximately $2,250. (PSR ¶ 14). The CS also raised the prospect of purchasing kilogram quantities of narcotics, in addition to the fentanyl pills. (PSR ¶ 14). Petitioner expressed an ability and willingness to supply the CS with kilogram quantities of narcotics, of either heroin or fentanyl. In this conversation, which was recorded, Petitioner said he would sell a kilogram of narcotics to the CS for approximately $55,000. (PSR ¶ 15). When the CS complained that this price was "high," Petitioner indicated that the narcotics were "good" and of high quality. (PSR ¶ 15).

On May 9, 2019, Petitioner sold approximately 425 fentanyl pills, weighing approximately 45.8 grams, to the CS in exchange for approximately $4,600. (PSR ¶ 16). During that recorded sale, Petitioner called another individual while the CS was present to discuss the price of a kilogram of narcotics. Petitioner negotiated the price of the kilogram, explaining that the CS

---

[1] "PSR" refers to the Presentence Investigation Report prepared by the Probation Office in connection with Petitioner's sentencing; "Tr." refers to the trial transcript; and "Sentencing Tr." refers to the transcript of Petitioner's August 19, 2020 sentencing hearing.

thought $55,000 was too expensive and Petitioner wanted to bring the price down. (PSR ¶ 16; Tr. 210-13). In an attempt at pushing the purchase price, Petitioner claimed, "I'm not crooked, I'm straight up." In the following days, the CS and Petitioner continued to discuss the purchase of a kilogram of either heroin or fentanyl. (PSR ¶ 17.)

Petitioner arranged to sell the CS a kilogram of either heroin or fentanyl on May 15, 2019. (PSR ¶ 17). On that date, Petitioner contacted the CS around 7:30 p.m. to tell the CS that he would soon have the drugs. (PSR ¶ 17). At approximately 8:40 p.m., law enforcement agents observed someone enter Petitioner's car for about thirty seconds. (PSR ¶ 18). About five minutes later, Petitioner contacted the CS to tell the CS that he had obtained the narcotics and was ready to proceed with the sale. (PSR ¶ 18). About fifteen minutes later, law enforcement agents conducted a stop of Petitioner's car. Petitioner granted consent to search his car, from which the agents recovered approximately 500 grams of heroin. (PSR ¶ 18). Law enforcement agents subsequently searched Petitioner's apartment and recovered, among other things: (1) approximately 286.4 grams of fentanyl, (2) approximately 98.4 grams of heroin and fentanyl, and (3) a scale used for drug packaging and distribution. (PSR ¶ 19).

### B. The Defense Case and Verdict

Petitioner called two character witnesses and testified in his own defense. He conceded that he sold drugs to the CS but testified, among other things, that he sold the drugs because a man named "Pepe" threatened to harm him if he did not do so. (Tr. 486, 491, 516, 519). Specifically, Petitioner claimed that in February 2019, Pepe—someone whom Petitioner had socialized with ten years earlier—contacted Petitioner and claimed to have won the lottery, had an unknown person

3

give the winnings to Petitioner, and asked Petitioner to send the winnings to the Dominican Republic. (Tr. 482.) Just two months later, in April 2019, Pepe won the lottery (again) and asked Petitioner to send the winnings, $2,000, to the Dominican Republic. (Tr. 484.) But Petitioner lost the money before he could send it to Pepe. (Tr. 486.) When Petitioner told Pepe that the money had been lost, Pepe immediately threatened to kill Petitioner and his entire family (Tr. 486, 488), and threatened to kill Petitioner sooner if the police were notified (Tr. 488, 491). Petitioner testified that he was going to repay Pepe $200 weekly, but Pepe "didn't want that." (Tr. 487.) Instead, Pepe enlisted Petitioner to engage in largescale narcotics trafficking on multiple occasions—narcotics that had a street value well in excess of Petitioner's $2,000 debt. Notwithstanding the overwhelming evidence presented at trial that Petitioner sold more than 1,000 fentanyl pills, attempted to sell a kilogram of fentanyl, and had heroin and fentanyl stuffed away in his dresser drawer and 500 grams of heroin in his car, Petitioner testified that he made no "independent decision" to sell drugs (Tr. 506); rather, his actions were the direct result of death threats made by Pepe and others. For example, Petitioner testified that sometime after the first sale to the CS, an unknown male approached Petitioner on the sidewalk and forced Petitioner—at knifepoint—to continue selling fentanyl. (Tr. 507.)

During cross examination, Petitioner admitted that he knew the substances he sold to the CS on multiple occasions were narcotics and that he had personally stored the heroin and fentanyl recovered from his bedroom. (Tr. 582-83, 593-4). In closing argument, Petitioner argued that he "did not intentionally sell drugs" (Tr. 649), and raised an entrapment defense, claiming that he was

4

not predisposed to commit the charged crimes, but instead was threatened by Pepe and pressured by the CS. (Tr. 630-649). On November 1, 2019, the jury returned a verdict finding Petitioner guilty on all five counts in the Indictment. (Dkt. 29).

### C. The Sentencing

Prior to sentencing, Petitioner proffered with the Government in attempt qualify for safety valve relief, pursuant to 18 U.S.C. § 3553(f). During his safety-valve proffer, Petitioner reiterated much of his trial testimony. (Dkt. 46 at 6). That is, Petitioner claimed that Pepe and an unknown male with a knife, with the assistance of the CS, threatened to kill Petitioner if he did not sell drugs and that was the sole reason for his participation in the conspiracy.

The Government concluded that Petitioner did not qualify for safety-valve relief. Specifically, the Government concluded, and argued to the District Court, that Petitioner's proffer statements and trial testimony "are incredible on their face and are belied by the overwhelming evidence at trial establishing that the defendant willfully, and without hesitation, sold more than 1,000 fentanyl pills and attempted to sell an entire kilogram." (Dkt. 46 at 6). For example, Petitioner claimed to be "terrified" during the narcotics transactions (Tr. 507), that he made no "independent decisions" to sell drugs (Tr. 506), and that he "really didn't want to" sell drugs (Tr. 492, 512). Yet, he always presented as calm and collected when interacting with the CS and during the multiple recorded narcotics transactions. During his initial meeting with the CS, Petitioner said he was a "straight shooter," that the fentanyl pills were "pure," and that the people he worked with were "heavy hitters." (Tr. 192). During the May 1, 2019 recorded conversation, the CS complained about Petitioner's quoted price for one kilogram of fentanyl. In an effort to move the

deal forward, Petitioner boasted about the quality of the fentanyl. At the end of the recorded conversation, the CS said that he wanted to buy more fentanyl pills at the end of the week, and Petitioner responded, "OK, my brother." (GX 302-T at 13.) And, in a recorded telephone call from April 30, 2019—right after the supposed knife incident—Petitioner stated, "all's good," and calmly discussed a future sale of fentanyl pills.[2]

The Government also noted that Petitioner's repeated claim that he feared for his and his family member's lives was at odds with the fact that he—not the CS—chose to conduct each drug transaction at the apartment building where Petitioner and his family (including his two-year-old niece) resided. (Tr. 189, 199, 209.)

In Petitioner's sentencing submission and at the sentencing hearing, defense counsel argued that Petitioner qualified for safety-valve relief because he acknowledged his involvement in the narcotics sales that were the subject of the Indictment. (Dkt. 44 at 11-16). Defense counsel argued that, even if the Court did not credit Petitioner's assertions about the reason for his involvement in the conspiracy, *i.e.*, the purported threats, Petitioner's admissions about the drug sales were sufficient to satisfy the requirements of the safety-valve provision. (Dkt. 44 at 13-16). The Government disagreed, noting that 18 U.S.C. § 3553(f)(5), and the cases interpreting it, require a defendant to be truthful about the entirety of his offense conduct, including the reasons for his involvement in the crime. *See United States v. Arce*, 276 F. App'x 13, 13 (2d Cir. 2008)

---

[2] The Government's sentencing submission set forth numerous examples of Petitioner's own words and conduct that strongly undercut his claim of being a "terrified" and a reluctant drug dealer. (Dkt. 46 at 7-8).

(affirming the district court's denial of safety-valve relief on the basis that the defendant was untruthful about his motivation for joining the narcotics conspiracy).

While the parties disputed the application of the 120-month mandatory minimum sentence, they agreed that absent safety-valve eligibility, the applicable United States Sentencing Guidelines range was 120 to 121 months' imprisonment. (PSR ¶ 83; Sentencing Tr. 2; Dkt. 44 at 1). The Government sought a Guidelines sentence. Petitioner sought a sentence below the applicable Guidelines range, noting the defendant's cognitive and mental health issues, steady employment history, and support of family members and friends. (Dkt. 44 at 4-9).

After hearing argument from the parties, Judge Rakoff sentenced Petitioner principally to 120 months in prison. Judge Rakoff rejected Petitioner's argument that Section 3553(f)(5) requires a defendant to be truthful only about certain portions of his offense conduct. (Sentencing Tr. 24). The Court concluded that Petitioner was not truthful about the alleged threats: "I thought [Petitioner] lied his head off mostly [and] [e]verything I have received from the papers suggests to me that he's continuing to lie." (Sentencing Tr. 23). Based on all the evidence, Judge Rakoff noted, "I didn't think it was even a close call. I thought it was clear he was lying." (Sentencing Tr. 28). The Court's conclusion was "based on [Petitioner's] demeanor, based on the other evidence in the case . . . tape recordings as well as live evidence." (Sentencing Tr. 23).

### D. The Appeal

Petitioner appealed his conviction and sentencing, challenging the Court's jury instructions. On March 15, 2022, the Second Circuit affirmed Petitioner's conviction. On July

29, 2022, Petitioner filed the instant motion under Title 28, United States Code, Section 2255, alleging that he received ineffective assistance of counsel.

**ARGUMENT**

The Motion seeks to vacate Petitioner's conviction and sentence on the basis that he received ineffective assistance of counsel and advances two bases for relief. *First*, Petitioner claims his attorney "refused" to advance the affirmative defense of duress. (Dkt. 57 at 3). *Second*, Petitioner argues he received ineffective assistance of counsel during sentencing because his attorney "failed to petition the court for a § 5k2.12 departure" based on the alleged threats. (Dkt. 57 at 4).

**I. Petitioner did not receive ineffective assistance of counsel.**

    **A. Applicable Law**

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings…." *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). To establish a claim of ineffective assistance of counsel, a petitioner must show (1) that the performance of his attorneys fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) that the petitioner suffered prejudice as a result of that representation. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984). Only where both prongs of the *Strickland* test are satisfied may a court conclude that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687.

A petitioner bears a "heavy burden" under the *Strickland* test. *United States v. Gaskin*, 364

F.3d 438, 468 (2d Cir. 2004). As to the first prong, courts must apply the "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. As to the second prong, the convicted defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 669.

Courts scrutinizing the performance of defense counsel in the context of ineffective-assistance-of-counsel claims "are 'highly deferential,' and must 'strongly presume[ ]' that counsel 'made all significant decisions in the exercise of reasonable professional judgment.'" *Rosemond*, 958 F.3d at 121, quoting *Strickland*, 466 U.S. at 689-690, 104 S.Ct. 2052. On ineffective-assistance questions concerning trial decisions, courts should "begin with a 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *United States v. Nolan*, 956 F.3d 71, 83 (2d Cir. 2020), quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

### B. Defense Counsel's Performance at Trial Was Not Deficient.

Petitioner contends that his counsel rendered ineffective assistance during trial because counsel "flat-out refused" to assert the affirmative defense of duress. Assuming the veracity of Petitioner's assertion that his attorney refused to pursue his preferred defense, Petitioner cannot demonstrate that decision was objectively unreasonable or that Petitioner suffered prejudice as a result.

9

The defense of duress requires that three discrete elements be met: "(1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of reasonable opportunity to escape harm other than by engaging in the illegal activity." *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005). "[T]he case law makes clear that the defense of duress is viable 'only . . . if there is a real emergency leaving no time to pursue any legal alternative.'" *United States v. Pestana*, 865 F. Supp. 2d 357, 361 (S.D.N.Y. 2011), *aff'd sub nom. United States v. Ortiz*, 525 F. App'x 41, 43 (2d Cir. 2013) (alteration in original) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 874 (5th Cir. 1998)). "Coercion that does not rise to this high level of legal duress" is relevant only to sentencing, not guilt or innocence. *Id.*

Before trial, the Government moved *in limine* to preclude Petitioner from raising a duress defense without establishing the requisite factual predicate for such a defense. (Dkt. 19 at 4-6). The Government argued that Petitioner would be unable to demonstrate a factual basis for a duress defense in light of, among other things, his repeated sales of narcotics to the CS over the course of several weeks. (Dkt. 19 at 4-6). Petitioner did not (and could not) refute this. In response to the Government's motion, Petitioner asserted (through counsel) that he would not advance a duress defense. Instead, Petitioner argued that evidence of the alleged threats was relevant to showing "lack[ ] of criminal intent." The Court disagreed but nonetheless permitted Petitioner to testify about the alleged threats in order to provide the full context of Petitioner's actions and because they were "tangentially" relevant to the entrapment defense and whether the defendant was

10

predisposed to sell narcotics. (Tr. 521). During her summation, defense counsel repeatedly emphasized the threats and argued that Petitioner was not predisposed to narcotics trafficking. Rather, Petitioner engaged in the narcotics sales because of the threats and pressure from the CS.[3]

Petitioner cannot establish that the strategic decision to pursue an entrapment defense instead of the affirmative defense of duress was objectively unreasonable. *First*, "[t]he decision whether to assert an affirmative defense is a matter of trial strategy that generally will not be second-guessed by a reviewing court . . . ." *Gordon v. Lavalley*, 13 Civ. 4401 (ALC) (AJP), 2014 WL 888468 *15 (S.D.N.Y. Mar. 6, 2014) (collecting cases). While a criminal defendant has a Sixth Amendment right to "make fundamental choices about his own defense," including whether to plead guilty or testify, decisions relating to strategy or trial management are left to defense counsel. *McCoy v. Louisiana*, 138 S. t. 1500, 1511 (2018). Courts have uniformly held that the decision to pursue an affirmative defense is a matter of trial strategy and thus ultimately a decision made by the defense attorney in consultation with the defendant. *See Gordon*, 2014 WL 888468 *15; *see also Zodhiates v. United States*, No. 14-CR-175-RJA, 2022 WL 3605957, at *12 (W.D.N.Y. Aug. 23, 2022) (noting that a requirement that defense counsel advance the defense preferred by the defendant could "put counsel in a double bind because to not raise the objectively better defense would constitute ineffective assistance of counsel").

---

[3] Petitioner's Motion asserts that "the only time the defendant's attorney sought to assert any form of [the duress] defense was during the jury instructions phase of the trial." (Mot. at 4). That is incorrect. The alleged threats were the centerpiece of the defense. However, because the duress defense was not legally or factually available, defense counsel argued that the threats were relevant to Petitioner's state of mind and his lack of predisposition to engage in narcotics trafficking.

11

*Second*, Petitioner offers no reason to second-guess counsel's strategic decision about the defense strategy. The evidence established, and Petitioner did not dispute in his testimony, that there were no threats of force directed at Petitioner at the time of each drug sale, much less a threat of sufficient seriousness to allow for the duress defense. The undisputed evidence was that Petitioner arranged to sell narcotics to the CS on four occasions. Three of those sales went forward, with Petitioner arriving alone to meet the CS and sell him drugs. In the fourth attempted sale, Petitioner again communicated alone with the CS and transported an approximate half-kilogram of heroin. Petitioner made numerous statements, many of which were recorded, to the CS regarding his willingness, ability, and desire to sell narcotics. In none of these instances was *any* threat of force directed at Petitioner. Because there can be no duress defense absent a "a real emergency leaving no time to pursue any legal alternative," *Pestana*, 865 F. Supp. 2d at 361, the duress defense was unavailable. Indeed, as the Court instructed the jury (an instruction affirmed by the Second Circuit), Petitioner "would not have a basis for claiming" the duress defense. (Tr. 477). Accordingly, the record demonstrates that defense counsel "made a strategic choice after thoughtful consideration," *Rosemond*, 958 F.3d at 121, quoting *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005), and Petitioner cannot rebut the strong presumption that such decision was sound.

In any event, Petitioner cannot establish that defense counsel's strategic decision affected the outcome of the trial. As the Court observed, "the jury obviously rejected" Petitioner's testimony (Sentencing Tr. 3); Petitioner "lied his head off mostly (Sentencing Tr. 23); and "I didn't think it was even a close call" (Sentencing Tr. 28). It is inconceivable that the jury, which rejected

12

Petitioner's testimony regarding the alleged threats for purposes of an entrapment defense, would have accepted his testimony for purposes of the more rigorous affirmative defense of duress. In short, the jury's rejection of Petitioner's testimony would have been fatal to a duress defense and therefore defense counsel's strategic decision unlikely affected the outcome of the trial.

### C. Defense Counsel's Performance at Sentencing Was Not Deficient.

Petitioner claims he received ineffective assistance because his attorney failed to seek a sentencing departure, pursuant to Section 5K2.12 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). This claim is without merit.

Section 5K2.12 of the Guidelines provides, in relevant part, that a sentencing court may depart downward "[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." A defendant bears the burden of proving all elements of a downward departure by a preponderance of the evidence. *United States v. Valdez*, 426 F.3d 178, 184 (2d Cir.2005). While defense counsel argued at sentencing that the Court should consider the alleged threats as "a moral component," counsel did not seek a departure pursuant to Section 5K2.12. This was a sound strategic decision.

To prove that Section 5K2.12 applied, Petitioner necessarily would have had to convince the Court that his trial testimony about the alleged threats was truthful. That would have been an unsurmountable task. At sentencing, the Court observed, bluntly, that Petitioner "lied his head off mostly" (Tr. 23), that it "was[n't] even a close call" (Tr. 28), and that all the evidence in the case such as "the tape recordings as well as live evidence" and Petitioner's "demeanor" during his

13

testimony led to this conclusion (Tr. 23). The Court's complete rejection of Petitioner's testimony regarding the alleged threats would have been dispositive on the applicability of Section 5K2.12.

In any event, Petitioner cannot possibly demonstrate that counsel's decision not to seek a Section 5K2.12 departure impacted the ultimate sentence. Given the Court's determination that Petitioner did not qualify for relief from the 120-month mandatory minimum sentence, the undisputed Guidelines range was 120 to 121 months' imprisonment. The Court imposed the lowest possible sentence—120 months. Thus, even if defense counsel had argued for a downward departure pursuant to Section 5K2.12 and the Court agreed, Petitioner would have received the same sentence, 120 months. Thus, even if counsel should have pursued a sentencing departure, counsel's failure to do so did not impact the ultimate sentence imposed by the Court. See *United States v. Lewis*, 523 F. App'x 814, 820 (2d Cir. 2013) (defendant could not show prejudice from defense counsel's failure to seek downward sentencing departure where district court sentenced defendant to the mandatory minimum sentence).

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Motion should be denied in its entirety.

Dated: New York, New York
November 17, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
Nicholas W. Chiuchiolo
Daniel G. Nessim
Assistant United States Attorneys
Tel.: 212-637-1247 / 2486